**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| OMAR KHAN, S.C.G.C. INC., a Texas corporation, S.C.G.M. INC., a Texas corporation, SCG-B INC., a Texas corporation, SCG-VP INC., a Texas corporation, DISTRICT THEATERS INC., a Texas corporation, SCG-WR LLC., a Texas limited liability company, SCG-CS INC., a Texas corporation, SCGK INC., a Texas corporation, SCG-SW INC., a Texas corporation,  SCGWL INC., a Texas corporation, and SCG-N INC., a Texas corporation,<br><br>Plaintiffs,<br><br>v.<br><br>CINEMEX USA REAL ESTATE HOLDINGS, INC., a Delaware corporation, and CINEMEX HOLDINGS USA, INC., a Delaware corporation,<br><br>Defendants. | C. A. No. _____ |

**PLAINTIFFS' VERIFIED ORIGINAL COMPLAINT**

Plaintiffs Omar Khan ("Khan"), S.C.G.C. Inc. ("SCGC"), S.C.G.M. Inc. ("SCGM"), SCG-B Inc. ("SCG-B"), SCG-VP Inc. ("SCG-VP"), District Theaters Inc. ("District Theaters"), SCG-WR LLC. ("SCG-WR"), SCG-CS Inc. ("SCG-CS"), SCGK Inc. ("SCGK"), SCG-SW Inc. ("SCG-SW"), SCGWL Inc. ("SCGWL"), and SCG-N,

Inc., ("SCG-N," and together with SCGC, SCGM, SCG-B, SCG-VP, District Theaters, SCG-WR, SCG-CS, SCGK, SCG-SW, and SCGWL, each a "Company" and collectively, the "Companies"), by and through their undersigned attorneys, file this Verified Complaint against Defendants Cinemex USA Real Estate Holdings, Inc. ("Buyer") and Cinemex Holdings USA, Inc. ("Parent," and together with Buyer, unless otherwise noted, "Cinemex"), and allege as follows:

## Nature of the Action

1.     This case is about preventing Cinemex—a large Mexican cinema company backed by a multi-billionaire—from exploiting the Coronavirus-induced public health disaster as a pretext for walking away from a legally binding agreement.

2.     On March 10, 2020, while the Coronavirus outbreak was already burgeoning, Cinemex entered into two related Equity Purchase Agreements (together, the "Agreement") to purchase Star Cinema Grill, a homegrown Sugar Land, Texas company solely owned by Omar Khan, a local businessman (the "Transaction").  Soon after that, Cinemex began executing a PR campaign focused on local and national publications.

3.     But as the economy inched closer to a recession, and without a legitimate basis to back out of the deal, Cinemex suddenly began claiming that the supposedly unforeseen situation caused by the Coronavirus somehow relieved Cinemex's obligation to close under the Agreement.  There is nothing in the Agreement to support that position.

4.      Far from being unforeseen, the potential impact of the Coronavirus was a significant factor discussed by the parties during their negotiation of the Agreement. Cinemex was even able to extract a multi-million dollar reduction in the purchase price for the Transaction by pointing to the Coronavirus outbreak and raising the possibility that it could force the Star Cinema Grill premises to close for an indefinite period of time. There is no doubt that Cinemex entered into the Agreement with its eyes wide open to the pandemic and its potential effects.

5.      While breaching the Agreement will have little, if any, real impact on Cinemex or its multi-billionaire backer, the same cannot be said for Omar Khan. By executing the Agreement, Khan believed he was entering into the Transaction with a large, well-funded company that would provide him with a sizeable cash payment and the corresponding liquidity to make certain other investments. As a result, Khan insisted on, and Cinemex agreed to, a provision in the Agreement that requires specific performance of Cinemex's obligation to close on the Transaction. That is the remedy Plaintiffs now seek.

6.      If Cinemex is not compelled to close the Transaction, Khan will be left to retain possession of his Companies as if the Transaction had never taken place—only now, facing significant changes in both internal and external circumstances bearing on the Business.

7.     Khan's ability to operate the Business will be impacted by Cinemex having already publicized the Transaction in the industry—and Khan having to now backtrack that announcement. The resulting confusion and uncertainty likely will erode the Business' goodwill and reputation in the marketplace as well as Khan's relationships with key business contacts, including film studios, service providers, and lenders.

8.     These contacts will be leery of investing their time and resources to build a relationship with Khan if they believe he will try to sell his Business again in the near term. Landlords will be less inclined to negotiate with Khan if they believe a sale of the Business is imminent.   Likewise, lenders are less likely to extend credit to Khan because any such financing would be short-term in the event of a sale of the Business.[1] These are significant roadblocks impairing Khan's ability to resuscitate the Business.

9.     Khan is facing an uphill battle to manage these issues—all caused by Cinemex's breach—while also navigating the fallout of the Coronavirus pandemic.  All the while, the clock continues to tick—internal cash flow models forecast that the cash reserves that are currently keeping the Business afloat will run out by this coming July.

10.     By walking away from a binding agreement, Cinemex will be harming not only Khan, but also his more than 1,000 employees and their families, and the community at large.

---

[1] Indeed, Khan has already been denied financing by one particular lender who had expressed concern over the uncertainty surrounding the Transaction.

11.     The stakes, therefore, could not be higher for Khan.  Accordingly, he seeks the Court's expedited consideration of his forthcoming Motion to compel Cinemex to specifically perform its obligations under the Agreement.

## Parties

12.     Plaintiff Omar Khan is an individual resident of the State of Texas.  Khan holds all of the equity interests in: S.C.G.C. Inc. ("SCGC"), S.C.G.M. Inc. ("SCGM"), SCG-B Inc. ("SCG-B"), SCG-VP Inc. ("SCG-VP"), District Theaters Inc. ("District Theaters"), SCG-WR LLC. ("SCG-WR"), SCG-CS Inc. ("SCG-CS"), SCGK Inc. ("SCGK"), SCG-SW Inc. ("SCG-SW"), SCGWL Inc. ("SCGWL"), and SCG-N Inc., ("SCG-N," together with SCGC, SCGM, SCG-B, SCG-VP, District Theaters, SCG-WR, SCG-CS, SCGK, SCG-SW, and SCGWL, each a "Company" and, collectively, the "Companies").

13.     The Companies together comprise Star Cinema Grill—the subject of the Transaction.  Star Cinema Grill (the "Business") is a Houston-based dine-in theater concept that offers guests first-run film releases, extensive food offerings, and a full service bar with a wide selection of beer, wine, and spirits.  Khan is also the President and CEO of the Business.

14.     Defendants Cinemex Holdings USA, Inc. ("Parent") and Cinemex USA Real Estate Holdings, Inc. ("Buyer") are both Delaware corporations and holding companies held by their parent, Grupo Cinemex S.A., a Mexican company (Parent and

Buyer together, unless otherwise indicated, "Cinemex") financed by a multi-billionaire based in Mexico. Cinemex owns and operates one of the largest cinema chains in the world, including 41 theaters in the U.S.

15.     Under the terms of the Agreement, Buyer sought to acquire from Khan all of his equity interests in the Companies. Parent guaranteed Buyer's payment of consideration, as well as Buyer's performance of all covenants, agreements, and obligations under the Agreement. (*See* Ex. A, Agreement, at § 12.14.)

<u>Jurisdiction, Venue, and Governing Law</u>

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) on the basis of diversity because:

    A.     Plaintiff Omar Khan is a resident of Texas;

    B.     All of the Companies are Texas corporations, except for SCG-WR, which is a Texas LLC;

    C.     SCG-WR's sole member is Omar Khan;

    D.     Defendants are both Delaware corporations; and

    E.     The amount in controversy, exclusive of interest and costs, exceeds $75,000.

17.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred here and because the parties

are subject to an Equity Purchase Agreement that specifically provides for the laying of venue in this district.

18.     Section 12.7 of the Agreement provides that it is governed by, and must be construed in accordance with, the laws of the State of Delaware.

## Relevant Facts

**A.     The Parties' Initial Negotiations**

19.     On December 3, 2019, Khan engaged an investment bank, PJ Solomon, to assist with the potential sale of his Companies.

20.     On December 19, 2019, PJ Solomon circulated an initial process letter (the "Phase I Letter") to all potential bidders for the Companies, including Cinemex. (*See* Ex. B, Phase I Letter.)

21.     On January 14, 2020, Cinemex sent a letter of interest ("IOI") to PJ Solomon, which contained an initial non-binding offer to purchase the Companies for $█████████

22.     On February 11, 2020, PJ Solomon circulated a second process letter (the "Phase II Letter") to all potential bidders, including Cinemex. (*See id.*)  The Phase II Letter set forth certain guidelines and requirements for submitting a formal bid to purchase the Companies.  For example, it set March 3, 2020 as the deadline for final bids and made clear Khan's requirement that any offer be able to close by no later than March 31, 2020.  (*See* Ex. C, Phase II Letter at 3.)

23.     The parties began discussing a potential purchase of the Companies by Cinemex after it had affirmed its ability to close any potential deal by March 31, 2020. Cinemex's professed ability to close by that date was critical to Khan's decision to select Cinemex as the buyer of the Companies.

24.     On March 3, 2020, Cinemex submitted a formal bid (the "Offer Letter") to acquire the stock and membership interests in the Companies for an all-cash purchase price of $███████. (*See* Ex. D, Offer Letter.)  The proposed purchase price in the Offer Letter reflected a discount from the amount in the IOI, based on the impact of the Coronavirus. Although Khan did not accept the offer in the Offer Letter, he continued to negotiate a potential purchase with Cinemex.

25.     In light of these ongoing negotiations, on March 6, 2020, the parties executed an exclusivity letter (the "Exclusivity Letter") whereby Khan agreed to continue discussing a potential purchase with Cinemex, on an exclusive basis, and on the terms outlined in the Offer Letter and the then-current form of the Agreement attached to it.  (*See* Ex. E, Exclusivity Letter.)

## B.     The Parties Execute the Agreement as the Coronavirus Outbreak Worsens

26.     The Coronavirus loomed over the parties' negotiations nearly every step of the way.  On January 20, a week after Cinemex sent the IOI, the first case of Coronavirus

in the U.S. was reported in Washington.[2]  Ten days later, on January 30, the World Health

Organization (WHO) declared a global health emergency.[3]

27.     During the last week of February alone, less than two weeks before Cinemex

sent its Offer Letter, Italy was locking down entire towns, the President requested funding

from Congress for a response, and the U.S. recorded its first Coronavirus-related death.[4]

28.     On March 5, 2020—the day before the parties executed the Exclusivity

Letter—major U.S. news outlets reported warnings from health officials that the

Coronavirus was on the verge of becoming a pandemic, and that a slew of new U.S. cases

had been confirmed in the days preceding those reports.[5]

29.     That same day, the U.S. Senate passed a multibillion-dollar emergency

spending package to combat the spread of the deadly virus.  (*Id.*)  The bill had passed in

the House of Representatives the previous day, just hours after appropriations leaders

introduced it.  (*Id.*)

30.     Indeed, the parties were well aware of the specter of the Coronavirus in the

days leading up to their execution of the Agreement and explicitly addressed the outbreak

---

[2] "A TIMELINE OF THE CORONAVIRUS PANDEMIC," *available at* https://www.nytimes.com/article/coronavirus-timeline.html (last accessed March 31, 2020).

[3] *Id.*

[4] *Id.*

[5] "SENATE PASSES $8.3 BILLION EMERGENCY CORONAVIRUS PACKAGE, SENDING BILL TO TRUMP'S DESK" *available at* https://www.cnbc.com/2020/03/05/senate-passes-8point3-billion-coronavirus-bill-sending-it-to-trumps-desk.html (last accessed March 31, 2020).

and its potential financial impact during negotiations.  Cinemex received a reduction of the

purchase price in recognition of that potential impact, including explicitly discussing that

Star Cinema Grill could potentially shut down for months.

31.     Eventually, the parties agreed on the terms of the Transaction, and on March

10, 2020, they executed the Agreement, which provided for Cinemex's purchase of the

Companies for a total enterprise price of $████████.[6]  This amount, along with other

adjustments in the Agreement, included an almost 10% discount from the parties' initial

discussions during the IOI stage.  The discounted purchase price was agreed upon by the

parties in consideration of the Coronavirus threat.

32.     As contemplated by the parties, the WHO designated the Coronavirus

outbreak as a global pandemic shortly thereafter.[7]

---

[6] The parties' final Agreement actually comprises two separate agreements, which together reflect the total purchase price of $████████.  The first agreement (attached as Exhibit A) was for Cinemex's purchase of all of the Companies, other than SCG-N, for $████████.  Cinemex purchased SCG-N pursuant to the second agreement (portions attached as Exhibit F) for $████████.  Aside from their respective purchase prices, both agreements contain similar terms, except that the SCG-N agreement included an additional term in Section 3.1 ("Closing Date") that required that closing take place no earlier than April 10, 2020.  Both of the agreements will herein continue to be referred to collectively as the "Agreement."

[7] *Id.*

33.     After the Coronavirus' designation as a global pandemic, Cinemex made several press releases to announce the Transaction.[8]

**C.     Relevant Provisions of the Agreement**

34.     Discussed below are the sections of the Agreement that are most relevant to the parties' dispute.

35.     **Closing**.  Section 3.1 of the Agreement outlines the process of closing the Transaction (the "Closing") by a certain date (the "Closing Date") that coincides with the parties' satisfaction of all conditions to the Closing (the "Closing Conditions").  The Agreement states that the Closing "shall be no later than the second Business Day after satisfaction (or waiver) of the conditions set forth in Article 8 (not including conditions which are to be satisfied by actions taken at the Closing)."  (*See* Ex. A at § 3.1.)[9]

36.     **Closing Conditions**.  Article 8 sets forth the conditions to each party's obligation to close the Transaction.  These include such customary conditions as:

---

[8] *See, e.g.*, Ex. G (3/11/20 Press Release); *see also* https://www.prnewswire.com/news-releases/cmx-cinemas-to-acquire-star-cinema-grill-301024969.html (last accessed March 31, 2020).

[9] Additionally, with respect to the SCG-N agreement discussed in n. 6, the Closing must occur on or after April 10, 2020.

A.  Each party's representations and warranties must be true as of the time of the Closing (or if untrue, does not rise to the level of being a Material Adverse Effect) (*see id.* at §§ 8.1(A), 8.2(A));

B.  Each party will have performed and complied with all covenants as of the time of the Closing (*see id.* at §§ 8.1(B), 8.2(B));

C.  There are no actions or proceedings in which an unfavorable resolution would prevent the Transaction from closing (*see id.* at §§ 8.1(C), 8.2(C));

D.  The parties will provide certain deliverables on or prior to the Closing Date (*see id.* at §§ 8.1(D), 8.2(D));

E.  Cinemex will have delivered all cash amounts to Khan (*see id.* at § 8.2(E)); and

F.  Since the parties' execution of the Agreement, no "Material Adverse Effect" shall have occurred (*see id.* at § 8.1(E)).

37.  **<u>Material Adverse Effect</u>**.  The Agreement includes a detailed definition of Material Adverse Effect ("MAE").  That definition contemplates certain changes or events on or after the date of the Agreement, the occurrence of which would result in a failure of a Closing Condition.  (*Id.* at § 1.1.)

38.  Importantly, the Agreement specifically excludes from the definition of MAE certain circumstances and events.   Among those excluded items are

conditions generally affecting the United States economy, the regulatory environment or credit, securities, currency, financial, banking or capital markets (including any disruption thereof and any decline in the price of any security or any market index or any changes in interest rates or exchange rates) in the United States or elsewhere in the world, . . . **any epidemics, pandemics, outbreaks, earthquakes, hurricanes, tornadoes or any other natural disasters (whether or not caused by any Person or any force majeure event) or any other national or international calamity or crisis[,] . . .[or] any change that is generally applicable to the industries or markets in which any member of the Company Group operates or in which products or services of any [Company] are produced, distributed or sold[.]**

(*Id.* (emphasis added)).

39.     In other words, none of the above-listed items—including pandemics like the Coronavirus—may be considered when determining whether an MAE has occurred.

40.     **Remedies for Breach**.  Section 12.11 provides that a party will suffer irreparable harm if the other party fails to perform its obligations under the Agreement, and that the aggrieved party "shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement." (*Id.* at § 12.11.)

41.     More specifically, the Agreement gives Khan the right to such relief in order to force Cinemex "to cause the transactions contemplated by this Agreement to be consummated, in each case, if the [Closing Conditions] set forth in Section 8.1 have been satisfied or waived." (*Id.*)

42.     Cinemex further agreed that it would "not oppose the granting of an injunction, specific performance and other equitable relief when expressly available

pursuant to the terms of this Agreement on the basis that [Khan] [has] an adequate remedy at law or an award of specific performance is not an appropriate remedy for any reason at law or equity." (*Id.*)

43.    **<u>Good Faith</u>**.   The Agreement specifically requires the parties to use commercially reasonable efforts to cause the Closing to occur.  (*See id.* at §§ 7.4, 8.3.)

## D.    Cinemex Breaches the Agreement

44.    On March 24, Khan's counsel emailed Cinemex's counsel to deliver all required closing deliverables, including payoff letters and third-party consents.  That email also served to notify Cinemex that Khan had satisfied all of the Closing Conditions as of that date and, pursuant to the Agreement, that Closing must take place within two business days—*i.e.*, by March 26 (or April 10 as to SCG-N).  Khan's counsel sought confirmation that Cinemex would be proceeding to close the initial Transaction by that date.  (*See* Ex. H, 3/24/20 email thread.)

45.    Cinemex's counsel responded later that day, claiming that "in light of COVID-19 related fallout, Cinemex will not and is not obligated to close this transaction. Among other things, Cinemex's operations and finance teams lack pre-Closing access to Star Cinema theaters and the Corporate Employees managing those theaters.  Attempting to close under these circumstances would imperil Cinemex personnel.  Moreover, key personnel are located in Mexico City and cannot get to Houston regardless because the US/Mexico border is closed." (*Id.*)

46. The next day, Khan, through his counsel, replied with a written demand that Cinemex reverse its position and proceed to the Closing in accordance with the Agreement. (*See* Ex. I, 3/25/20 Letter from N. Gorga to J. Mercado.)

47. Cinemex's counsel responded to the demand letter on March 26, again claiming generally that, "in light of the current situation relating to the Coronavirus pandemic (COVID-19), Cinemex is not required to close the transaction at this time." (*See* Ex. J, 3/26/20 Letter from J. Mercado to N. Gorga.)  Cinemex's response sought to justify its breach further by claiming that the Closing must physically occur in Houston, Texas, that Cinemex is entitled to perform a physical inspection of the theaters upon Closing, and that the Coronavirus pandemic triggered the equitable doctrines of impossibility, impracticability, illegality, frustration of purpose, and commercial frustration, which further excused Cinemex from performing its obligations.

48. In all communications with Khan to date, Cinemex has never alleged that Khan is in breach or has failed to perform any of his obligations under the Agreement.

**E.    Cinemex Cites No Valid Basis for Failing to Perform Under the Agreement**

49. None of Cinemex's cited grounds has any basis in the Agreement or otherwise justifies Cinemex's breach.  The parties specifically and extensively discussed the potential for harm posed by the Coronavirus pandemic prior to executing the Agreement—including the possibility of the subject theaters being forced to close indefinitely.

50.     Indeed, Cinemex even received a multi-million dollar reduction of the purchase price for this very reason.

51.     The Agreement itself specifically addresses the possibility of "epidemics, pandemics, outbreaks, . . . any other natural disasters (whether or not caused by any Person or any force majeure event) or any other national or international calamity or crisis," and prohibits Cinemex from claiming that any such occurrence constitutes a failure of a Closing Condition to justify Cinemex's non-performance. (*See* Ex. A at § 1.1.)

52.     There is nothing in the Agreement that requires that the Closing physically occur in Houston or at the premises of any of the Companies, or that guarantees Cinemex's ability to physically inspect the theaters and access employees at the time of Closing.[10] Sections 7.2 and 7.9 of the Agreement require only that Khan provide Cinemex with "reasonable access to and the right to inspect all of the properties, assets, premises, books and records, contracts, agreements and other documents and data related to the Company Group" and with "reasonable access to each Corporate Employee."

53.     Additionally, Cinemex's claim that an in-person Closing is required to allow Cinemex to inspect the Companies' property is debunked by the terms of the SCG-N agreement discussed above. That agreement also includes a situs provision that specifies Houston as the place of closing—despite SCG-N being located in Illinois. Cinemex offers this sham argument for the sole purpose of shirking its obligation to close the Transaction.

---

[10] Indeed, not all of the theaters are even located in Houston.

54.     On the other hand, Khan made every effort to cooperate with Cinemex and eventually close the transaction.  He tried to accommodate Cinemex's concerns by offering things like price concessions and service agreements.  He even offered to push back the closing for *months* (so long as Cinemax provided a reasonable deposit) until Cinemex was willing and able to travel to Houston as it purportedly desired to do.

55.     Khan also made clear to Cinemex, on several occasions, that he would provide full and unfettered access as required by the Agreement.  For weeks, Cinemex had the opportunity to physically access the Companies and the relevant premises and employees, yet chose not to do so.  Khan further offered to provide transition services at no cost to Cinemex (and to make his team available, at cost) to oversee and manage the assets of the Business until such time that Cinemex could travel to the U.S.

56.     Even with the travel restrictions that were enacted in response to the Coronavirus, Khan remained willing to make any relevant documents or personnel available to Cinemex via videoconferencing and other electronic/virtual means.  Again, however, Cinemex elected not to do so.  Cinemex cannot now use this as an excuse to try to evade its obligations under the Agreement.

**F.     Cinemex's Breach Will Cause Khan to Suffer Irreparable Harm**

57.     In addition to monetary damages stemming from losing the proceeds of the Transaction, Khan and the Companies will suffer additional, irreparable harm because of

Cinemex's breach—including a demised reputation and loss of goodwill in the marketplace.

58.    By executing the Agreement, Khan believed that he was entering into a transaction with a billionaire-backed company that would make a large cash payment, which would in turn provide him with the liquidity to make certain other investments.

59.    If Cinemex is not compelled to honor the Agreement, Khan will retain possession of the Companies, but with the added burden of dealing with the significant harm inflicted on the Business by Cinemex's decision to back out of the deal.  Khan's relationships with vendors, service providers, lenders, landlords and the like will suffer, as will the Business' goodwill and standing in the marketplace.  Coupled with the lack of operational cash, these factors—all caused by Cinemex's refusal—threaten to irreparably harm the Business and create problems where none existed prior to the Transaction.  This is precisely why Khan insisted on, and Cinemex agreed to, a provision in the Agreement that requires specific performance of Cinemex's obligation to close on the Transaction.

60.    The resulting damages are impossible to quantify and show that Khan will undoubtedly suffer irreparable harm if Cinemex is able to evade its contractual obligations. The calculated decision being made by this billionaire-backed company to evade its contractual obligations  could lead to the total loss of a Texas-based business and more than 1,000 jobs primarily in the Houston area.

61.     There is no valid basis for Cinemex to avoid performing its obligations under the Agreement.  Cinemex's improper actions have left Khan with no choice but to seek expedited and emergency relief from this Court, including specific performance.

## Count I – Breach of Contract

62.     Khan repeats and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

63.     The Agreement is a valid contract that is binding on the parties.

64.     Khan has fulfilled all of his obligations under the Agreement and has not otherwise breached any of its provisions.

65.     Section 3.1 of the Agreement obligates Cinemex to proceed to Closing within two business days of the satisfaction of all conditions to Closing.

66.     Khan satisfied all applicable Closing Conditions as of March 24, 2020. Accordingly, the Agreement required Cinemex to close the initial Transaction by March 26 (and on April 10 with respect to Cinemex's acquisition of SCG-N).

67.     Cinemex has refused to comply with its contractual obligations and proceed to the Closing.

68.     In Section 12.11 of the Agreement, Cinemex expressly agreed to the remedy of specific performance in the event of its breach of the Agreement.

69.     Cinemex's breaches will deprive Khan of the benefit of his bargain, cause him monetary damages, and inflict additional harm for which Khan has no adequate remedy at law.

70.     Khan is thus entitled to an Order from this Court that directs Cinemex to specifically perform their obligations under the Agreement and close the Transaction.

## Prayer for Relief

WHEREFORE, Khan respectfully requests judgment and relief against Cinemex as follows:

A.     Ordering Cinemex to specifically perform their obligations under Sections 3.1 and 12.11 of the Agreement and proceed to the Closing of the Transaction;

B.     Granting preliminary and permanent injunctive relief requiring Cinemex to close the Transaction as set forth in the Agreement;

C.     Ordering Cinemex to pay any additional damages suffered by Khan as a result of Cinemex's breach of the Agreement, in an amount to be determined at trial;

D.     Awarding Khan his costs and attorneys' fees incurred in connection with Cinemex's breach of its covenants, as contemplated under the Agreement; and

E.     Granting Khan such other and further relief as the Court deems just and proper.

April 1, 2020                                    Respectfully submitted,

                                                 */s/ Jeff M. Golub*

                                                 Jeff M. Golub
                                                 (attorney in charge)
                                                 State Bar No. 00793823
                                                 Federal Bar No. 21606
                                                 BECK REDDEN LLP
                                                 1221 McKinney Street, Suite 4500
                                                 Houston, TX 77010
                                                 (713) 951-6281
                                                 (713) 951-3720
                                                 jgolub@beckredden.com


                                                 **OF COUNSEL:**

                                                 Nick Gorga (*pro hac vice* pending)
                                                 Mohamed Awan (*pro hac vice* pending)
                                                 HONIGMAN LLP
                                                 2290 First National Building
                                                 660 Woodward Avenue
                                                 Detroit, MI 48226-3506
                                                 (313) 465-7000
                                                 ngorga@honigman.com
                                                 mawan@honigman.com